**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| PEGGY A. TUCKER, | ) | CASE NO. 1:16-cv-01596 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Social Security,* | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Peggy A. Tucker (hereinafter "Plaintiff"), challenges the final decision of

Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter

"Commissioner"), denying her applications for a Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.   Procedural History

On December 28, 2012, Plaintiff filed her applications for POD, DIB, and SSI, alleging a disability onset date of January 1, 2011. (Transcript ("Tr.") 13, 173-185).   The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 101-126).   Plaintiff participated in the hearing on January 22, 2015, was represented by counsel, and testified. (Tr. 32-58).   A vocational expert ("VE") also participated and testified. *Id*.   On February 18, 2015, the ALJ found Plaintiff not disabled. (Tr. 22).   On April 26, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-4).   On June 24, 2016, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1).   The parties have completed briefing in this case. (R. 12, 16 & 17).

Plaintiff asserts the following assignments of error: (1) the ALJ's Step Four finding is not supported by the evidence due to the mischaracterization of the record and the ALJ's reliance on outdated opinion evidence, and (2) the ALJ failed to evaluate or assign weight to a treating source's opinion. (R. 12).

## II. Evidence

### A. Personal and Vocational Evidence

Plaintiff was born in November of 1958 and was 52-years-old on the alleged disability onset date. (Tr. 173).   She has a high school education. (Tr. 203).   She had past relevant work as a small parts assembler. (Tr. 21).

2

**B. Relevant Medical Evidence**[1]

**1. Treatment Records**

On February 13, 2012, Plaintiff was seen by Elizabeth Klenk, M.D., and Plaintiff reported her pain was 0 out of 10.[2] (Tr. 256).   She had poor insight and judgment. (Tr. 257).   She had not been dieting or exercising, as she lacked motivation. *Id*.   Dr. Klenk diagnosed essential hypertension, benign; morbid obesity, and tobacco dependence. *Id*.   Dr. Klenk noted that Plaintiff's gait was "slowed, wide-based, and due to body habitus." (Tr. 257).   Plaintiff's muscle strength was 5/5 throughout and "gait is normal; the patient is able to heel, toe and tandem walk without difficulty." *Id*.

On March 12, 2012, Plaintiff reported to Dr. Klenk that her pain was 3 out of 10. (Tr. 261). She had a slow, wide-based gait due top body habitus. (Tr. 263).   She weighed 335 pounds. *Id*.

On February 19, 2013, Plaintiff reported to Dr. Klenk that her pain was 0 out of 10. (Tr. 377).   She had mild dyspnea (shortness of breath) on exertion. *Id*.   She was negative for muscle cramps, muscle weakness, and joint pain. *Id*.   Her Body Mass Index ("BMI") was 60. *Id*.   She had not been exercising or following a diet. *Id*.   She had a slow, wide-based gait due to body habitus. (Tr. 379).

On March 5, 2013, x-rays of Plaintiff's knees revealed "[n]o acute osseous findings of either knee," and "[b]ilateral tricompartment osteoarthritic changes with varus angulation," greatest in the medial compartments. (Tr. 272).

---

[1]  The recitation of the evidence is not intended to be exhaustive and has been truncated by the court in the interests of brevity. It includes only those portions of the record cited by the parties in their briefs *and* also deemed relevant by the court to the assignments of error raised.

[2]  Plaintiff's argument that her pain rating was somehow limited to hypertension, as discussed in the analysis below, is not well taken and unsupported by the record.

On March 7, 2013, Plaintiff reported to Dr. Klenk that her pain was 0 out of 10. (Tr. 374). Dr. Klenk continued to recommend weight loss, exercise, and smoking cessation. (Tr. 376).

On May 21, 2013, Plaintiff complained to Dr. Klenk of bilateral leg pain in her shins and ankles. (Tr. 320).   Swelling of the feet was mild. *Id*.   She also described pain "behind her knees." *Id*.   She rated her pain as 2 out of 10, but 9 out of 10 with exercise when standing for long periods of time or when ascending/descending stairs. *Id*.   On examination, Plaintiff had "decreased Rom [range of motion] with bilateral ankle flexion, extension, inversion, and eversion; pain with bilateral ankle flexion, extension, inversion, and eversion; Crepitus, Tenderness, Effusion: tenderness noted in the both ankles." (Tr. 323).   Dr. Klenk assessed joint pain, of the lower leg, morbid obesity, ear pain, osteoarthritis of the knee, and impaired fasting glucose. *Id*.

On June 7, 2013, Plaintiff reported to Dr. Klenk that her pain was 0 out of 10. (Tr. 315). Review of symptoms indicated that Plaintiff was positive for limb pain, but negative for muscle cramps, muscle weakness, and joint pain. *Id*.   On examination, Plaintiff was morbidly obese and in no apparent distress. (Tr. 317).   Again, she had a slow, wide-based gait due to body habitus. *Id*.   Dr. Klenk continued to recommend weight loss, exercise, and smoking cessation. (Tr. 318).

On June 17, 2013, Plaintiff reported her knee pain was 6 out of 10 bilaterally, to Lawrence Pabst, M.D. (Tr. 288, 341).   Dr. Pabst noted that Plaintiff's "ankles and pes bursal areas [inner knees], she feels, are mild enough that we can control this without injections, which we did review with her…. She is on Naproxen and we will continue that…. She would like to avoid joint replacement and this would be the last recommendation." (Tr. 344).

On July 22, 2013, Plaintiff reported to Dr. Pabst that her pain was 5 out of 10, and 6 out of 10 in her ankles bilaterally. (Tr. 282).   On objective examination, Plaintiff weighed 320 pounds

with a BMI of 60. (Tr. 284).   Her knees showed no effusion, some synovitis, some crepitans with motion, negative McMurray's test, and were "stable." *Id*.   Dr. Pabst examined Plaintiff's ankles noting no effusion, possibly "a little synovitis," pain and swelling primarily along the medial and lateral malleoli, and no crepitans. *Id*.   Plaintiff had full motion and stability and good strength in all tendon groups of the ankles. *Id*.

On August 5, 2013, Plaintiff reported her pain was 6 out of 10—7 of 10 while standing. (Tr. 286).

On August 8, 2013, Plaintiff reported to Dr. Klenk that her pain was 0 out of 10. (Tr. 310). Review of symptoms indicated that Plaintiff was positive for bilateral leg pain, but negative for muscle cramps and muscle weakness. *Id*.   On examination, Plaintiff was morbidly obese and in no apparent distress. (Tr. 312).   Again, she had a slow, wide-based gait due to body habitus. (Tr. 313).   Dr. Klenk noted that Plaintiff has refused an increase in medications, because she disagrees an increase is necessary, and had been "unwilling to take meds." (Tr. 314).

On September 9, 2013, Plaintiff reported to Dr. Klenk that her pain was 0 out of 10. (Tr. 305).   Plaintiff refused to start recommended medications. (Tr. 308).

On September 17, 2013, Plaintiff reported to Dr. Pabst that her foot pain was 3 out of 10, rising at times to 9 out of 10. (Tr. 334).   On examination, "[t]he ankle itself is negative. The heel is negative. Plantar fascia is negative and the rest of the mid forefoot are negative. There may be a little swelling but I do not feel any crepitance. On resistance it is intact and competent." (Tr. 336).   Plaintiff noted her ankle may be getting a little better, and she had been using orthotics in her shoes to correct her stance. *Id*.   Dr. Pabst noted his treatment as conservative, and preferred not to perform injections due to improvement. (Tr. 337).   He recommended use of a compounding cream and Epsom salt soaks. *Id*.

On October 8, 2013, Plaintiff reported to Dr. Klenk that her pain was 0 out of 10. (Tr. 301). She also reported crying spells and sadness. *Id*.

On October 18, 2013, Plaintiff again reported to Dr. Klenk that her pain was 0 out of 10. (Tr. 296).   She complained about skin tags. *Id*.

Throughout the remainder of 2013 and during 2014, Plaintiff reported her pain was 0 out of 10 on at least eight occasions. (Tr. 291, 348, 353, 358, 363, 367, 383, 399).   On a few of those occasions Plaintiff reported significant increases in pain with standing or walking. (Tr. 358, 399). During other medical appointments during the same time period, Plaintiff points to seven occasions where she rated her pain between 3-4 of 10 and 8 of 10. (R. 12, PageID# 483-484, Tr. 279, 358, 390, 392, 395, 397, 399).

On May 21, 2015, *several months after the ALJ's decision*, Plaintiff was seen by James Kerbs, M.D. (Tr. 404-405).   On physical examination, Plaintiff had a BMI of 62.3. (Tr. 404). She had mild effusion in both knees, and he noted pain at the patellofemoral and medial joint line. *Id*.   He diagnosed bilateral knee osteoarthritis and morbid obesity. *Id*.   Dr. Kerbs opined that she was "not a safe candidate to undergo knee arthroplasty as she needs" until her BMI is at least less than 50. *Id*.   He referred her to a dietician, offered her an injection that Plaintiff refused, and asked her to do aquatic physical therapy. *Id*.   He indicated that if Plaintiff did not attempt to improve her situation to allow for surgery, he would refer her to someone else. (Tr. 404-405).

### 2.   Medical Opinions Concerning Plaintiff's Functional Limitations

On March 5, 2013, Plaintiff was seen by Khozema Rajkotwala, M.D., for a disability examination, which included manual muscle testing. (Tr. 265-271).   Plaintiff had normal range of motion and strength in the upper and lower extremities bilaterally with no muscle spasm,

muscle atrophy, spasticity, clonus, or primitive reflexes present. (Tr. 265-268).   A physical examination revealed unremarkable findings, and Plaintiff's gait was noted to be intact. (Tr. 270-271).   Exercise testing yielded no contraindication. (Tr. 271).   Dr. Rajkotwala opined that Plaintiff "can sit, stand, and walk with some difficulty. Lift and carry 20-25 lbs. frequently and 25-30 lbs. occasionally." *Id.*

On May 9, 2013, State Agency physician Leigh Thomas, M.D., reviewed the evidence of record and opined that Plaintiff, in an 8-hour workday, could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; sit for "[m]ore than 6 hours on a sustained basis;" stand/walk for 4 hours; frequently climb ramps/stairs and stoop; occasionally climb ladders/ropes/scaffolds, kneel, crouch, and crawl; and perform unlimited balancing. (Tr. 94-98).

## C. Relevant Hearing Testimony

At the January 22, 2015 hearing, Plaintiff testified as follows:

- At her last job, she lifted, on average, 20 pounds a day.   She was pretty much seated throughout the day. (Tr. 33).   The job ended when the plant relocated to Mexico. (Tr. 35). She attended Marion Technical College after her job ended, but quit after two semesters. (Tr. 36).

- She started to have problems with both knees while she was still employed, but did not seek out treatment until 2013.   She waited until 2013, because she finally obtained medical insurance at that time. She was having problems standing, walking, and climbing stairs.   She initially saw her regular physician, who referred her to a specialist. (Tr. 37).

- The specialist had x-rays taken of her knees, and she received injections that gave her several days of relief.   She was also prescribed a topical gel that did not help the pain. (Tr. 38).

- She can stand for approximately 20 minutes before needing to sit down. (Tr. 38).

- She also has problems with both ankles, and they cause her pain about four or five days a week. (Tr. 39-40).   Soaking her feet in Epsom salts sometimes helps relieve the pain and stiffness.   The specialist did not offer any treatment beyond use of a topical gel for her ankles. (Tr. 40).

- She inquired about a cane with Dr. Klink, who gave her a prescription, which she had yet to fill. (Tr. 40-41).

- She does not look forward to grocery shopping and buys a lot of items so she can take care of it "in one go." She can walk around the store for 20 minutes, and her legs are stiff by the time she reaches the checkout. (Tr. 41).   For the rest of that day, her "ankles and [her] knees are like screaming at me." *Id.*

- She performs chores "little by little," such as dusting. (Tr. 41).

- Her knees crack and it is painful for her to bend her knees. (Tr. 42).

- She needs knee replacements for both knees, but was waiting until she lost weight.   She weighs 330 pounds.   She was not on a weight loss program and had not altered her diet. She did not remember telling the doctor that she ate what she wanted when she wanted. (Tr. 42-43).   She was diagnosed as a diabetic a few years earlier.   She was taking medication, but was not on insulin. (Tr. 43).

- She did not remember when her back pain started, but it "comes and goes." (Tr. 43).   Her pain was in the center of her lower back.   She received treatment from a chiropractor once every week or two. (Tr. 44).   Sitting helps relieve her pain. (Tr. 45).

- She makes homemade greeting cards for nursing homes around the holidays.   Near the holidays, she would spend five or six hours a day working on them. (Tr. 45).   The rest of the year she makes birthday cards or get-well cards for people she knows. (Tr. 45-46).

- She attends church Wednesdays and Sundays, and is able to sit through an hour-long service. (Tr. 46).

- Her knee and ankle pain was worse than in 2013. (Tr. 46).

The VE testified that Plaintiff's past relevant work would be designated as that of a small parts assembler, Dictionary of Occupational Titles ("DICOT") 706.684-022, light exertional, unskilled with an SVP of 2. (Tr. 47).   The ALJ posed the following hypothetical question to the VE:

> If I found that Ms. Tucker was capable of lifting, carrying, pushing and pulling 20 pounds occasionally and 10 pounds frequently; able to sit for six hours out of an eight-hour workday and able to stand and walk for four hours each; only occasional climbing of ramps and stairs and never any ladder, rope or scaffold;

limited to frequent stooping and occasional crouching, kneeling and crawling, would she be able to return to that previous employment?

(Tr. 48).

After some additional questioning by the ALJ, the VE explained that an inability stand/walk for 6 hours constituted and accommodation. (Tr. 50-53).   The VE testified that "at a light exertional level … the essential functions are performed standing or walking six out of eight hours at the light exertional level, standing or walking.   And so that restriction of four out of eight hours either standing or walking on an accommodated work setting at a light exertional level, unskilled work setting with a work opportunity remains and that would -- that's going to be less than at the light exertional level of the expectation of an employer." (Tr. 50-51).   However, when the ALJ inquired whether the hypothetical individual could perform Plaintiff's past relevant work *as performed*, the VE responded that she could.[3] (Tr. 53).

The VE further identified the following jobs that could be performed with a sit/stand variance: storage facility rental clerk, DICOT 295.367-026, light, unskilled with an SVP of 2 (73,150 jobs nationally, 2,880 in Ohio); parking lot attendant, DICOT 915.473-010, light, unskilled with an SVP of 2 (35,525 nationally, 960 in Ohio); and, office helper/clerical assistant, DICOT 239.567-010, light, unskilled with an SVP of 2 (83,250 jobs nationally, 2,480 in Ohio). (Tr. 51-52).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of*

---

[3] According to a form completed by Plaintiff, which the ALJ specifically referenced during his questioning of the VE, the assembler job involved walking one hour, sitting for eight hours, and standing for zero hours. (Tr. 53, 220-221).

*Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).   A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).   First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b).   Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c).   A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923.   Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d).   Fourth, if claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).   For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

## IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: osteoarthritis of the knees and ankles, morbid obesity, diabetes mellitus with peripheral neuropathy, and lumbar degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally or 10 pounds frequently. She can sit for about 6 hours in an 8-hour workday and can stand and/or walk for about 4 hours of an 8-hour workday. She can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds. She can frequently stoop.   She can occasionally crouch, kneel, or crawl.

6.  The claimant is capable of performing past relevant work as a Small Parts Assembler.   This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2011, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 15-21).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is

supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*)   However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.   Plaintiff's Assignments of Error**

**1. Step Four Finding**

**a. Mischaracterization of the Record**

In the first assignment of error, Plaintiff alleges that the ALJ mischaracterized the record. (R. 12, PageID# 479-488).   This argument is completely bereft of any legal analysis, and fails to cite a single case, statute, or regulation.   Reading Plaintiff's argument as a whole, she appears to take issue with the ALJ's interpretation of the evidence.   The ALJ, however, is not required to incorporate into the RFC every symptom alleged by a claimant. *See, e.g., Harris v. Barnhart*, 171 Fed. App'x 211, 214 (9th Cir. 2006) ("The ALJ is not required to accept every symptom of which a claimant complains as rising to the level of a functional limitation.").   Moreover, courts

"may not reweigh conflicting evidence on appeal, but instead must affirm" if a decision is supported by substantial evidence. *Haun v. Comm'r of Soc. Sec.*, 107 Fed. App'x 462, 465 (6th Cir. 2004); *see also Steed v. Colvi*n, 2016 U.S. Dist. LEXIS 114027 (N. D. Ohio, Aug. 25, 2016) (McHargh, M.J.) ("While [the plaintiff] may disagree with the ALJ's explanation or her interpretation of the evidence of record, her disagreement with the ALJ's rationale does not provide a basis for remand."); *Kiser v. Colvin*, No. CV 14-170, 2016 WL 527942 at *3 (E.D. Ky. Feb. 8, 2016) ("To the extent that Plaintiff suggests that … evidence is open to another interpretation that favors his claim, the Court declines to reweigh the evidence in this fashion."); *Whetsel v. Comm'r of Soc. Sec.*, No. 2:15-CV-3015, 2017 WL 443499, at *8 (S.D. Ohio Feb. 2, 2017) ("[I]t is not this Court's job to reweigh the evidence, but only to determine if the ALJ has evaluated it in a reasonable fashion."), *report and recommendation adopted*, No. 2:15-CV-3015, 2017 WL 1034583 (S.D. Ohio Mar. 16, 2017).   Therefore, it is questionable whether Plaintiff raises a cognizable claim to the extent she is merely taking issue with the ALJ's interpretation of the evidence.

However, assuming *arguendo* that Plaintiff's "mischaracterization of the evidence" claim presents a reviewable issue, the court finds the ALJ did not, in fact, unreasonably construe the evidence.   Plaintiff takes issue with the ALJ's statement that Plaintiff "typically reported 0/10 pain levels," which she characterizes as inaccurate. (R. 12, PageID# 482-485, *citing* Tr. 19). The court disagrees.   First, the ALJ did not find that Plaintiff exclusively reported 0 of 10 pain. Rather, the ALJ specifically cited and considered other portions of the record where Plaintiff reported pain. (Tr. 17-18, *citing* Exhs. 6F & 7F).   Second, Plaintiff contends that her 0 of 10 pain reports related solely to hypertension, diabetes, or other impairments that do not generate pain. The court could reach such a conclusion only after interpreting the evidence in the light

13

most favorable to the claimant. But neither the ALJ nor this court is obligated to do so. Moreover, the treatment records where Plaintiff reports that her pain level was 0 of 10, which are referenced above in the summary of the medical records, do not confine her pain reporting to any specific condition or impairment, but rather report Plaintiff's general pain level conveyed to her primary care provider. (*See, e.g.*, Exh. 8 at Tr. 291-325; Exh. 16F at Tr. 374-380; Exh. 18F at Tr. 383).   The court is unconvinced that patients would report their general pain level as zero to a primary care physician when, in fact, they are experiencing significant pain, simply because the appointment might concern another impairment.

Plaintiff also takes issue with the ALJ's statement that "[t]here is no evidence indicating that the claimant ambulates with an abnormal gait…." (R. 12, PageID# 481-482, *citing* Tr. 19). She points to repeated instances in the record where her gait is described as slow and wide-based, but she omits that this was due to body habitus. *Id.*   Plaintiff assumes that such a gait is inherently abnormal, yet does not cite any medical authority to support this assumption, or specifically point to a treatment note indicating as much.   To the contrary, though Dr. Klenk typically noted the presence of a gait that was "slowed, wide-based, and due to body habitus," she, nevertheless, often indicated in the same note that Plaintiff's gait remained "normal." (Tr. 257, 263, 379).

In addition, Plaintiff suggests the ALJ mischaracterized the record by indicating there was no evidence of aggressive treatment. (R. 12, PageID# 482, *citing* Tr. 19).   Plaintiff only cites one treatment record to support her argument that the ALJ was incorrect—a statement by Dr. Kerns that Plaintiff needed to undergo bilateral knee arthroplasty, but that her morbid obesity was prohibitive. *Id.*   The treatment record, however, *post-dates* the ALJ's decision by several months.   The ALJ cannot reasonably be faulted for failing to factor into his analysis a record

that did not exist at the time of the decision.

Finally, Plaintiff takes issue with the ALJ's observations that she did not seek any treatment prior to 2012; that she continued to collect unemployment through the first quarter of 2012, the latter which presumes that an individual is both capable of work and actively seeking work; and, that she attended school in 2011. (R. 12, PageID# 485-486, *citing* Tr. 19-20).   Plaintiff asserts that these reasons are of no merit given that she requested that her alleged onset date be amended to March 5, 2013. (*Id.*, *citing* Tr. 127-128).   The Commissioner acknowledges that the ALJ appears to have been unaware of this request, as the decision continued to use January 1, 2011, as the alleged onset date. (R. 16, PageID# 506, *citing* Tr. 13).   These observations, however, merely relate to the ALJ's credibility assessment.   Plaintiff has not raised a legal argument explicitly arguing any substantive or procedural deficiency with respect to the ALJ's credibility analysis in her Brief on the Merits. (R. 12).   Accordingly, she has waived any argument on the issue. *See, e.g., Siple-Niehaus v. Comm'r of Soc. Sec.*, No. 5:15cv01167, 2016 WL 2868735 at n. 12 (N.D. Ohio, May 17, 2016) (finding that plaintiff "has not challenged the ALJ's credibility determination" and, therefore, "arguments pertaining to the ALJ's assessment of her credibility have been waived.") (Burke, M.J.); *cf. Williams v. Comm'r of Soc. Sec.*, No. 2:14cv2655, 2016 WL 2733518, at *2 (S.D. Ohio May 10, 2016) (declining to consider Plaintiff's argument challenging the ALJ's credibility determination, because it was not raised before the Magistrate Judge in the statement of errors).   Moreover, Plaintiff has failed to articulate why these statements would necessitate a remand.

### b. Past Relevant Work as Performed

Plaintiff argues that the ALJ's finding that she could perform her past relevant work as a small parts assembler, as she actually performed, is not supported by substantial evidence. (R.

12, PageID# 479-481; R. 17, PageID# 520-521).   The ALJ concluded the following:

> The vocational expert identified the claimant's past work as a Small Parts Assembler, DOT# 706.684-022. The vocational expert stated that the Dictionary of Occupational Titles ("DOT") defines this work as a light, unskilled, SVP 2 job. However, in testimony and in her Work History report at Exhibit 5E, the claimant reported that when she performed this job, she lifted and carried up to 20 pounds, and frequently lifted less than 10 pounds. She reported that she walked for a total of one hour in a workday and sat for eight hours in a workday.   The vocational expert testified that the claimant's description of the essential job duties as she actually performed them is not consistent with the DOT. The record reflects that the work described by the vocational expert constituted the claimant's past relevant work because the job was done within the last 15 years, the job lasted long enough for the claimant to learn how to do it, and the wages from the job were indicative of substantial gainful activity.
>
> The vocational expert testified that the hypothetical individual of the claimant's age, education, and residual functional capacity could not return to this past job as it is defined in the DOT, but that she could do it as actually performed.
>
> The vocational expert's testimony was accepted and adopted because it was not contradicted and was based on his qualifications, professional experience, and sources of information that are known to be reliable. Accordingly, the undersigned finds that the claimant can return to her past relevant work as actually performed.

(Tr. 21)

Plaintiff contends that her past work, as she actually performed it, required sitting for 8 hours per workday. (R. 12, PageID# 480, *citing* Tr. 221).   More accurately, in a form completed by Plaintiff, she indicated that her job involved one hour of walking, no standing, and 8 hours of sitting. (Tr. 221).   She argues that because the ALJ's RFC states that she can only sit for about 6 hours in an 8-hour workday, she cannot perform the 8-hour sitting requirements of her past job as she actually performed it. (R. 12, PageID# 480, *citing* Tr. 16).

First, Plaintiff's assertion that her job required 8 hours of sitting is questionable.   Given that she also indicated one hour of walking was required, this would translate into a 9-hour workday (or longer with breaks) instead of the customary 8-hour day used in social security

16

cases.   At most, in an 8-hour workday, Plaintiff's position indicates she would sit for 7 hours, if her statement that she walked for one hour is credited.[4]

Second, while Plaintiff is correct in noting that the summary of the RFC finding stated that Plaintiff can "sit for about 6 hours in an 8-hour workday," Plaintiff fails to read the ALJ's decision as a whole. (Tr. 16).   The ALJ expressly cited Dr. Thomas's opinion that Plaintiff "could sit for *more than* 6 hours." (Tr. 20) (emphasis added).   The ALJ went on to ascribe "great weight to Dr. Thomas' exertional capacity assessments because they are consistent with the greater weight of the medical evidence." *Id.*   Finally, the ALJ went even further and explained that "[t]he residual functional capacity finding in this decision *accepts and adopts* Dr. Thomas' assessment at Exhibit 6A with regard to the claimant's lift, carry, sit, stand, and walk abilities, because that assessment is consistent with the evidence." (Tr. 20) (emphasis added).   It is true that the ALJ's heading in the decision at section 5 summarily states that Plaintiff could sit for *about* 6 hours, but that does not fully capture the ALJ's decision to *adopt* Dr. Thomas's opinion that Plaintiff could sit for *more than* 6 hours on a sustained basis in an 8-hour workday (Tr. 20, Exh. 6A at Tr. 95)—the latter ability is unquestionably consistent with the ability to perform Plaintiff's past relevant work as she actually performed it.   The court, however, declines to find any reversible error based on a piecemeal reading of the decision that appears to reflect, at worst, a mere drafting inconsistency.   Reading the decision as a whole, the ALJ unequivocally explained that he was incorporating Dr. Thomas's opinion that Plaintiff could sit for *more than* 6 hours into the RFC.   As such, Plaintiff's argument that the RFC placed a

_____

[4] While Plaintiff stated that she sat for the vast majority of the day at her past job, it is not altogether clear whether such sitting was *required* or whether the job could have been performed sitting or standing or some combination thereof.

maximum ceiling on sitting at 6 hours is not well taken.[5]

Finally, in the alternative, if the court were to agree with Plaintiff for the sake of argument that she could not perform her past relevant work, as she actually performed it, due to an inability to sit for longer than 6 hours, it would not result in a recommendation to reverse the ALJ's decision because the court construes such error as harmless.   The VE testified to the existence of numerous other jobs that satisfied the 6 hours of sitting and 4 hours of standing/walking restrictions, all of which were at the light exertional level. (Tr. 50-52).   As discussed above in the summary of the hearing testimony, the VE identified the jobs of a storage facility rental clerk, parking lot attendant, and officer helper/clerical assistant. *Id*.   Together, those jobs amount to 191,925 jobs nationally and 6,320 in Ohio, which would constitute a significant number of jobs as determined by past decisions of other courts in this district.[6]  *Id*.   A

---

[5]  Plaintiff's Brief on the Merits even acknowledges that "[t]he ALJ adopted the RFC formulated by reviewing physician, Dr. Thomas." (R. 12, PageID# 486, *citing* Tr. 20).   Plaintiff's argument that Dr. Thomas's opinion was old and deficient and should not have been adopted reflects a misunderstanding of this court's review.   The court does not stand in the shoes of the ALJ.   As stated in the standard of review set forth above, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard*, 889 F.2d at 681.

[6]  By way of example, a recent decision from this district found as follows:

> Because he could still perform jobs in the third category, which had 2,000 available jobs, the Sixth Circuit held that a significant number of jobs existed….   In this case, even if the housekeeper or cleaner jobs were excluded, the ALJ still identified parking lot attendant and courier clerk as two other jobs available in significant numbers in the national economy. This conclusion was based on vocational expert testimony that there were 3,400 parking lot attendant jobs available regionally and 126,200 parking lot attendant jobs nationally; and 2,600 courier clerk jobs available regionally and 183,200 courier clerk jobs nationally. *Id.* There is no "one special number" that constitutes a "significant number," and courts are to evaluate each case individually. *Hall*, 837 F.2d at 275.   Because there were 6,000 jobs available regionally and 309,400 jobs available nationally, the Court finds that the ALJ's conclusion that jobs were available in significant numbers was supported by substantial evidence. *See also, e.g., Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1174–75 (6th Cir. 1990) (2,500 jobs a significant number); *Nejat*, 359 Fed. App'x at 579 (2,000 jobs a significant number).

*Selzer v. Colvin*, No. 1:16CV276, 2017 WL 405246 at *3-4 (N.D. Ohio Jan. 31, 2017) (Pearson, J.)

court from the Southern District of Ohio, addressing similar circumstances, found any error at Step Four harmless:

> Thus, the VE's testimony is sufficient to support the ALJ's non-disability determination at Step Five of the sequential evaluation process.  ***Even though the ALJ did not proceed to this step of the sequential evaluation process, the ALJ's decision should nonetheless be affirmed given that substantial evidence supports the decision and remand would be a useless formality***. *See Wilson*, 378 F.3d at 547 (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game") (q*uoting NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n. 6, 89 S. Ct. 1426, 22 L. Ed. 2d 709 (1969)).   "No principle of administrative law or common sense requires [the Court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Dekruger*, No. 08-10410, 2009 U.S. Dist. LEXIS 20145, 2009 WL 596123, at *12 (*quoting Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).

*Mabrey v. Comm'r of Soc. Sec.*, 1:13-cv-555, 2015 WL 556435 at *5 (S.D. Ohio Feb. 10, 2015) (emphasis added), *adopted by* 2015 WL 1412205 (Mar. 26, 2015); *contra McIver v. Comm'r of Soc. Sec.*, No. 13-14103, 2015 WL 574906 at *1 (E.D. Mich., Feb. 11, 2015) (finding that the ALJ's error at Step Four was not harmless despite the VE identifying a significant number of other jobs that could support a Step Five finding because "[t]he ALJ stopped at step 4. He never made a step 5 determination. It is not for the Court to make that determination in place of the ALJ.")

The court agrees with the reasoning of the *Mabrey* decision that remands would be a useless formality where an error at Step Four could be cured by a plain reading of the hearing transcript which includes substantial evidence (testimony from a VE) to support a finding at Step Five that a significant number of jobs exist that Plaintiff could perform.   Therefore, the court alternatively recommends finding that any error at Step Four was harmless, given the clear testimony demonstrating the number of available jobs that satisfied the restrictions in the RFC.

### 2.  Treating Physician's Opinion

In the second assignment of error, Plaintiff asserts that the ALJ failed to assess the opinion of a treating physician, Dr. Klenk. (R. 12, PageID# 488-489).

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)).   In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).   If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give "good reasons" for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5).   The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

It is well-established that administrative law judges may not make medical judgments. *See*

20

*Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)).   Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009).   "An example of a good reason is that the treating physician's opinion is 'unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.'" *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

Specifically, Plaintiff contends that the ALJ erred by not addressing Dr. Klenk's prescription for a handicapped placard and corresponding notation that Plaintiff "can ambulate less than 200 feet without stopping." (R. 12, PageID# 488, *citing* Tr. 324).   Again, Plaintiff has identified no law suggesting that the prescription for a handicapped placard constitutes a "medical opinion" for the purposes of a social security disability. *Id.*

Conversely, the Commissioner has identified the following authority, albeit largely non-binding, that suggests otherwise. *See Halsell v. Astrue*, 357 Fed. App'x 717, 722 (7th Cir. 2009) ("successful application for a disability parking placard … proves nothing unless the disability standard is the same") (*citing Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (observing that a doctor ordering a disability placard "adds nothing to a finding of disability here because

21

there is no evidence that the two have substantially similar requirements for finding a person to be disabled.")); *Moore v. Colvin*, No. 13-cv-614-FHM, 2014 WL 5765665 at *3 (N.D. Okla. Nov. 5, 2014). The *Moore* court concluded: "the checking of a box on the application for a parking placard, standing alone, does not qualify as a medical opinion that the ALJ was required to discuss. Thus, there was no error in the ALJ's failure to discuss Dr. Peavey's 'opinion' in the Handicapped Parking Placard Application." *Id*. (*citing Parmley v. Astrue*, 2008 WL 3850250 (E.D.Ky. August 15, 2008)); *see also Bryant v. Astrue*, No. 09-4159, 2010 WL 4628721 at *7 (D. Kan. Nov. 8, 2010) (finding that while ALJ "did not explicitly mention" a doctor's "comment upon the application for a permanent disabled parking placard," … the ALJ is not obliged to discuss every piece of evidence in his decision … [and] the court does not believe [the] statement is so probative as to require discussion.") (internal citations omitted); *see also Land v. Comm'r of Soc. Sec.,* No. 1:08-cv-885, 2010 WL 670594 at *7 (W.D. Mich., Jan. 20, 2010) (doctor's opinions that "plaintiff was disabled and his decision to approve plaintiff for a handicapped parking placard were not entitled to any special significance.")

Based on the above authority, the court declines to find that the ALJ's failure to discuss the prescription for a handicapped placard is tantamount to ignoring a treating source's opinion concerning a claimant's medically-based functional limitations.   In addition, even if the notation in the handicap permit indicating Plaintiff needed to stop ambulating after approximately 200 feet of walking, were construed as such a limitation, there is no basis for concluding that such a restriction is patently inconsistent with the ability to stand/walk for a total of 4 hours in an 8-hour day.   Simply put, there is no evidence that 4 hours of standing/walking, spread throughout an 8-hour workday, would necessitate walking in excess of 200 feet at any one time.   Also, as pointed out by the Commissioner, Plaintiff has not pointed to any evidence suggesting that her

past job as a small parts assembler, as she performed it, required walking in excess of 200 feet at a time given her claim that it involved only one hour of walking total per day.

While it would have been better practice for the ALJ to address the notation of Dr. Klenk concerning the handicapped parking placard, Plaintiff has simply failed to identify any authority suggesting such a notation is tantamount to a medical opinion or that failure to discuss such an "opinion" from a treating source is reversible error.[7]   Therefore, the second assignment of error is without merit.

### IV. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be AFFIRMED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: May 23, 2017

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).   Failure to file objections within the specified time may waive the right to appeal the district court's order.   *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[7]  Although it is possible that there exists some authority to support Plaintiff's position, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) (internal citations omitted)).